# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

ROBERT KEITH ABEL,

       Plaintiff,

vs.

                              CIVIL ACTION NO.: CV207-088

HARLEY LAPPIN, Director, Federal
Bureau of Prisons, *et al.*,

       Defendants.

## MAGISTRATE JUDGE'S ORDER

## AND REPORT AND RECOMMENDATION

Plaintiff, who is currently incarcerated at the Mahoning County Jail in Youngstown, Ohio, filed a cause of action pursuant to pursuant to 28 U.S.C. § 1331 and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), contesting the conditions of his confinement while he was incarcerated at the Federal Correctional Institution in Jesup, Georgia ("FCI Jesup"). Defendants Harley Lappin, Director of the Bureau of Prisons ("BOP"); Harrell Watts, Administrator of National Inmate Appeals; Bethzadia Ricoff, Medical Director, Southeast Region; Newton Kendig, Medical Director for the BOP, Central Office; Mike Nelson, former Chief of Health Programs; Joyce Young, an employee of the Health Programs Branch; R.E. Holt, Regional Director, Southeast Region; Lisa Sunderman, Regional Counsel, Southeast Region; Lillian Jimenez, Health Services Administrator, Southeast Region; Robert McFadden, former Warden at FCI Jesup; Jose Vasquez, former Warden at FCI Jesup;

Dr. Louis Burgos, former Clinical Director, FCI Jesup; Dr. Martha Chipi, Clinical Director, FCI Jesup; Thomas Ellis, former Health Services Administrator, FCI Jesup; FNU Shaw, Unit Manager; FNU Wheeler, Unit Case Manager; R. Sumner, Unit Counselor; Jeffrey Allen, Chief of Health Programs Branch, Central Office; and the BOP ("Defendants") filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment. Plaintiff filed a Response. Defendants filed a Reply. For the reasons which follow, Defendants' Motion should be **GRANTED** in part and **DENIED** in part.

## STATEMENT OF THE CASE

Plaintiff asserts that, while he was an inmate at FCI Jesup, he was supposed to have a liver biopsy after he tested positive for hepatitis C. Plaintiff asserts he discussed his situation with Dr. Burgos and Ellis, and they would not allow Plaintiff to have a liver biopsy, even though the Central Office approved this procedure. Plaintiff contends he filed a BP-9 with Sumner and that Warden McFadden, despite having knowledge of his need for a liver biopsy and treatment, denied his BP-9. Plaintiff contends he continued telling Warden McFadden about Dr. Burgos' and Ellis' denial of his needed treatment, yet Warden McFadden did nothing. Plaintiff also contends Wheeler and Sumner called him to Wheeler's office, and Sumner told him he was going to be transferred to another institution and that he would not be getting treatment for his liver. Plaintiff alleges he finally received a liver biopsy two and one half years after he requested it and one and one half years after the Central Office approved it. Plaintiff asserts Dr. Chipi, Dr. Burgos' replacement, refused to provide him with necessary follow-up treatment after the biopsy. Plaintiff avers Shaw reviewed all of the documentation Plaintiff had submitted and told Plaintiff he did not have any right to receive treatment for a condition

he had when he entered the penal system. Plaintiff also alleges Warden Vasquez (McFadden's replacement as Warden) knew he needed treatment for his liver problems but told him he was going to be transferred to another institution. Plaintiff asserts he was transferred not once, but twice, and that prison staff were deliberately indifferent to his serious medical needs; Plaintiff contends these actions were taken because staff knew Plaintiff had filed grievances. Plaintiff also contends he informed Defendants Lappin, Watts, Ricoff, Kendig, Nelson, Allen, Young, Holt, Sunderman, and Jimenez, all of whom are or were in supervisory positions with the Bureau of Prisons, about his need for treatment, and that these Defendants did nothing to assist him. Finally, Plaintiff generally asserts Defendants conspired to delay his access to medical treatment and to transfer him.

Defendants aver Plaintiff received appropriate medical care and treatment and that Plaintiff's "disagreement with the medical judgment of his health providers does not rise to the level of a constitutional violation." (Doc. No. 64, p. 4). Defendants also aver they did not conspire against him, nor did they retaliate against Plaintiff to have him transferred to other penal institutions.

## MOTION TO DISMISS STANDARD OF REVIEW

In considering a motion to dismiss filed pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, a court must determine whether a plaintiff's "[f]actual allegations [are] enough to raise the right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." Bell Atlantic Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1969 (2007)[1]. In making this determination, a

---

[1] In Twombly, the Supreme Court "retired" the "no set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), and noted that, while "a complaint attacked by a Rule 12(b)(6) motion to dismiss

court must construe the complaint in a light most favorable to the plaintiff. Christopher v. Harbury, 536 U.S. 403, 406 (2002). When evaluating a motion to dismiss, the issue is not whether a plaintiff will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." Little v. City of North Miami, 805 F.2d 962, 965 (11th Cir. 1986). The threshold is "'exceedingly low'" for a complaint to survive a motion to dismiss. Ancata v. Prison Health Services, Inc., 769 F.2d 700, 703 (11th Cir. 1985) (quoting Quality Foods de Centro America, S.A. v. America Agribusiness Devel., 711 F.2d 989, 995 (11th Cir. 1983)). A complaint filed by a *pro se* plaintiff is held to even less stringent standards than a complaint drafted by a lawyer. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (citing Conley, 355 U.S. at 45-46, 78 S. Ct. at 102).

## DISCUSSION AND CITATION TO AUTHORITY

### I. Improper Service

Defendants assert Plaintiff's Complaint should be dismissed as to all individual defendants for insufficiency of process and insufficiency of service of process pursuant to Rules 12(b)(4) and (5) of the Federal Rules of Civil Procedure. Defendants contend the Court lacks in personam jurisdiction over them as a result. Defendants also assert there is no evidence they have been served on an individual basis with copies of the summons and Complaint. Defendants further assert that effective service of process upon individual defendants requires a signed waiver of service, personal service, or service pursuant to the law of the state in which the district court is located and that neither Georgia law nor federal law permits service on an individual defendant by certified mail. Defendants contend the United States Marshals Service attempted

---

does not need detailed factual allegations," a plaintiff is obliged to "provide the grounds of his entitlement to relief", which requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" 550 U.S. at ___, 127 S. Ct. at 1264-65.

service upon Defendants, but Plaintiff provided the Marshals Service with improper addresses. Defendants contend the United States Attorney and the Attorney General of the United States have been served, but they have not been served on an individual basis.

Plaintiff asserts Defendants should be required to waive personal service or to be properly served in person at their own expense. Plaintiff alleges he properly identified each individual Defendant and listed his or her position and last known place of employment with the Bureau of Prisons. Plaintiff asserts the Court entered an Order on January 17, 2008, directing the Marshals Service to serve the individual Defendants with a copy of that Order and Plaintiff's Complaint. Plaintiff asserts he has filed motions with the Court in an attempt to have the individual Defendants served to no avail.

The United States Attorney's Office, on behalf of the Bureau of Prisons and other Defendants sued in their individual capacities, filed a Motion for Extension of Time to Answer or Otherwise Defend on March 25, 2008. In this Motion, the United States Attorney's Office stated, "Upon information and belief, all defendants are believed to be served. The United States Attorney was served on January 25, 2008,. . . [and o]ther individual defendants have been served on later dates[.]" (Doc. No. 47, p. 2). The United States Attorney's Office also stated it had "under consideration several representation requests by all of the individual defendants remaining in this case" and that it did "not have the authority to file answers on the individual defendants' behalf but [did] anticipate that such authority will be forthcoming for most, if not all, of the significant number of individual Defendants." (Id.) The United States Attorney's Office filed a second Motion for Extension of Time to Answer or Otherwise Defend on May 28,

2008; in this Motion, the United States Attorney's Office stated, "All of the individual Defendants have requested representation by the United States which has been granted in each instance." (Doc. No. 58, p. 2). The undersigned granted each of these Motions. (Doc. Nos. 48, 59). Additionally, the Marshals Service filed Returns of Service for 17 individually named Defendants, (Doc. Nos. 18-34), and deadlines for the filing of Answers were set. Moreover, Plaintiff has filed several pleadings through which he sought service and/or address information for the Defendants. (Doc. Nos. 37, 39, 42, 45, 51).

Plaintiff's Complaint should not be dismissed based on Defendants' contention that they were not personally served with a copy of the Complaint and summons. The United States Attorney's Office has presented itself as offering representation to the individual Defendants. The Marshals Service filed Returns of Service for nearly all individual Defendants, and it is no fault of the Plaintiff that the addresses to which the service papers were directed were incorrect. Further, Plaintiff has attempted on several occasions to serve the individual Defendants "properly" despite his limited resources as a pro se prisoner. This portion of Defendants' Motion should be **denied**.

## II.    The Bureau of Prisons and the United States of America

Defendants contend that, to the extent Plaintiff makes any allegations against the Bureau of Prisons ("BOP") and the United States of America[2], these claims are not

---

[2] The Clerk's Office added the United States of America as a named Defendant inadvertently. Plaintiff did not name the United States of America as a Defendant.

cognizable under Bivens and should be dismissed. Plaintiff asserts that, to the extent he has named the BOP as a Defendant, his claims should be dismissed.[3]

To the extent Plaintiff seeks to hold the BOP and the United States of America liable for any alleged constitutional violations pursuant to Bivens, he cannot do so. See FDIC v. Meyer, 510 U.S. 471, 485-86 (1994) (stating the proper defendants in a Bivens claim are the federal officers who allegedly violated the plaintiff's constitutional rights, not the federal agency which employs the officers). This portion of Defendants' Motion should be **granted**. Plaintiff's Bivens claims against the BOP and the United States of America should be **dismissed**.

## SUMMARY JUDGEMENT STANDARD OF REVIEW

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part[ies are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004). An issue of fact is "material" if it might affect the outcome of the case, and an issue of fact is "genuine" when it could cause a rational trier of fact to find in favor of the nonmoving party. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004). The court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. at 1260 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

---

[3] Defendants also move for dismissal of Plaintiff's claims against them in their official capacities. However, these claims were dismissed by the Honorable Anthony A. Alaimo by Order dated April 1, 2008. (Doc. No. 50).

The moving parties bear the burden of establishing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving parties must identify the portions of the record which establish that there are no genuine issues of material fact. Hickson, 357 F.3d at 1260 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). When the nonmoving party would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. Id. In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Acevado v. First Nat'l Bank, 357 F. 3d 1244, 1247 (11th Cir. 2004).

## I.    Supervisory Liability

Defendants assert Plaintiff does not plead his allegations with sufficient factual specificity to show that Defendants Lappin, Kendig, Young, Holt, Watts, and Sunderman[4] are liable for any alleged violation of Plaintiff's constitutional rights. Lappin, Kendig, Young, Holt, Watts, and Sunderman contend Plaintiff has not shown that they were personally responsible for any alleged action taken against Plaintiff. In short, Lappin, Kendig, Young, Holt, Watts, and Sunderman aver they are entitled to the dismissal of Plaintiff's claims against them based on respondeat superior principles.

---

[4] Plaintiff asserts Defendant Jeffery Allen was not employed with the Bureau of Prisons' Health Programs Branch until January 2007 and that, based on that, his claims against Defendant Allen should be dismissed. (Doc. No. 78, p. 33, n.3). Plaintiff also asserts his claims against Defendant McFadden should be dismissed. (Id. at p. 63, n. 14). Based on these assertions, Plaintiff's claims against Defendants Allen and McFadden should be **dismissed**.

Plaintiff contends Lappin, Kendig, Young, Holt, Watts, and Sunderman[5] knew that Dr. Burgos and Ellis refused to schedule a liver biopsy for him. Plaintiff also contends Lappin, Kendig, Young, Holt, Watts, and Sunderman knew of the constitutional infirmities associated with the 2003 Guidelines under which his liver condition was treated.

"It is well established in this circuit that supervisory officials are not liable under Bivens for unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003). However, supervisors "'can be liable . . . when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of plaintiff[], and his conduct was causally related to the constitutional violation committed by [the] subordinate.'" Id. (quoting Greason v. Kemp, 897 F.2d 829, 836 (11th Cir. 1990)). "A causal connection may be established when: 1) a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." Matthews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007) (internal citation omitted).

In his Declaration, Harley Lappin ("Lappin"), the Director of BOP, contends he is responsible for "the general overall supervisory management and oversight of the BOP." (Defs.' Ex. 39, ¶ 4). As Director, Lappin asserts he delegates specific functions and

---

[5] Plaintiff's claims against Defendants Young, Ricoff, and Jimenez appear to be analyzed more appropriately in the "Deliberate Indifference" section of this Report.

tasks pertaining to the operation of the BOP, its institutions, and the management of the inmate population, including the inmates' care. Lappin states his office, which is located in Washington, D.C., receives hundreds of letters a week from inmates and their family members, and because of this volume, he is unable to personally respond to each letter. Lappin also states that the correspondences received in his office are processed by a member of his staff, who in turn reviews the letters and forwards them to the appropriate department or division for responses. Lappin contends that any letter Plaintiff may have directed to his office would have been forwarded to the appropriate party for response. (Id. at ¶ 7).

Harrell Watts ("Watts"), the Administrator for National Inmate Appeals in Washington, D.C., asserts he supervises the Administrative Remedies Program. Watts also asserts administrative remedy appeals regarding medical treatment issues are sent to the Health Services Division for investigation and response. Watts states he relies on medical staff to determine the necessary medical care an inmate should receive and that he is not involved in the decision-making process to determine what treatment is medically necessary. Finally, Watts states he had no personal involvement with any of the allegations Plaintiff raised in his Complaint. (Defs.' Ex. 40).

In his Declaration, R.E. Holt ("Holt"), the Regional Director of the Southeast Region for the BOP, states he is responsible for the administrative supervision of the BOP facilities in his region, and, accordingly, he does not participate in the day-to-day management of inmates. Holt avers that he does not recall receiving any correspondence from Plaintiff, but, if he had, Holt would have directed it to Health Services for response. Holt also avers that he would not overrule a decision made by

Health Services if it did not deem Plaintiff's medical treatment improper. Holt further avers that the only interaction he would have had with Plaintiff would have been through the administrative remedy program but that he (Holt) did not review or sign Plaintiff's Administrative Remedy appeal regarding his hepatitis C. (Defs.' Ex. 41).

Lisa Sunderman ("Sunderman") is the Regional Counsel for the Southeast Region for the BOP. Sunderman states in her Declaration that she does not participate in the day-to-day management of inmates. Sunderman asserts that, while the Legal Department reviews the responses to correspondences for legal concerns, any correspondence regarding medical issues is directed to Health Services for response. Sunderman contends that Health Services makes the final determination about the appropriateness of inmates' medical treatment and that, if Health Services did not feel Plaintiff's medical condition warranted postponing his transfer, she would not have overruled this decision. (Defs.' Ex. 42).

Defendant Newton Kendig ("Kendig"), a medical doctor and a rear admiral in the United States Public Health Service, is assigned to the BOP. Kendig states he is the Medical Director and the Assistant Director of the Health Services Division; his office is in Washington, D.C. Kendig states that he does not diagnose or prescribe treatment for any specific inmate and that he had no direct involvement with Plaintiff or his health care. Kendig also states the BOP Central Office reviews and approves (or disapproves) the treatment of hepatitis C. Kendig further states that he delegates the responsibility for this review to the Chief of Health Programs, who also is responsible for responding to administrative remedy appeals raising medical care issues. (Defs.' Ex. 44).

Defendant Joyce Young ("Young") has been an administrative officer in the Office of the Chief of Health Programs in Washington, D.C., since September 1993. Young alleges that she handles the administrative tasks of the office, such as ordering supplies, making copies, and managing records. Young asserts that, although she works in the medical department, she is not a medical practitioner, nor is she a supervisor. Young states her only involvement with Plaintiff was to request information from his medical record for use by the medical staff and that she had nothing to do with the medical care provided to Plaintiff. (Defs' Ex. 38).

Plaintiff filed an Affidavit in which he states he wrote letters to Lappin on three (3) occasions—July 17, August 31, and November 5, 2003. Plaintiff also states he included a copy of his administrative remedy request and appeals challenging the 2003 Guidelines and sent a courtesy copy of each of his correspondences to Kendig, Holt, and Sunderman. Plaintiff asserts none of these Defendants responded to his requests to intervene and to direct Dr. Burgos and Ellis to schedule a liver biopsy. (Pl.'s Ex. 1, ¶ 9). Plaintiff contends he wrote Lappin again on March 3, 2004, after the Central Office's offer for him to have a liver biopsy and that Dr. Burgos and Ellis told him he would never receive a biopsy or treatment for his hepatitis C. Plaintiff also contends he sent a courtesy copy of this correspondence to Watts, Kendig, Holt, and Sunderman. Three months later, Plaintiff asserts he had received no response to his letter, and he wrote Lappin again and begged him to direct one of his subordinates to intervene on his behalf. (Id. at ¶¶ 10-12). Plaintiff states he wrote Lappin on three (3) occasions after his liver biopsy was performed and after he filed a grievance against Dr. Burgos and

Ellis for deliberate indifference to his serious medical needs in 2005 and sent courtesy copies of these correspondences to Kendig, Holt, and Sunderman. (Id. at ¶ 13).

Plaintiff also submitted copies of letters directed to Lappin's attention, which were courtesy copied to Kendig, Holt, and Sunderman. In these correspondences, Plaintiff requests that Lappin direct his subordinates to direct institutional staff, particularly Dr. Burgos and Ellis, to order a liver biopsy or that he receive treatment after his biopsy was performed. (Pl.'s Exs. 16-18, 23). Watts signed the response to Administrative Remedy No. 306238-A1 dated January 6, 2004, by which it was "determined that a liver biopsy will be offered to [Plaintiff] to determine the status of [his] liver and whether treatment is indicated." (Pl.'s Ex. 19, p. 6).

The evidence before this Court indicates Plaintiff seeks to hold Defendants Lappin, Watts, Holt, Young, Sunderman, and Kendig liable for alleged constitutional violations based on their positions within the BOP's hierarchy. This evidence indicates that Plaintiff informed these Defendants that he was unhappy with the medical care and treatment Dr. Burgos and Ellis provided him at FCI Jesup and asked at least Lappin to intervene on his behalf. However, there is no evidence before the Court that Lappin, Watts, Holt, Young, Sunderman, or Kendig knew that, based on a review of Plaintiff's medical records and the Guidelines in place at the time, Plaintiff was being subjected to unconstitutional treatment. This portion of Defendants' Motion should be **granted**. Plaintiff's claims against Defendants Lappin, Watts, Holt, Young, Sunderman, and Kendig should be **dismissed**.

## II.  Deliberate Indifference to Serious Medical Needs

Ellis and Dr. Burgos assert the Central Office did not approve Plaintiff for a liver biopsy, it was a recommendation only.  Defendants contend the Utilization Review Committee ("URC") had to review this recommendation for approval and prioritization. Ellis avers he is not a clinical practitioner and could not recommend or schedule Plaintiff for a liver biopsy without the approval of the Clinical Director.  Dr. Burgos, the Clinical Director, asserts he obtained a liver biopsy for Plaintiff, it just did not occur as quickly as Plaintiff desired.  Dr. Burgos also asserts he reviewed Plaintiff's medical records and prioritized the liver biopsy based upon Plaintiff's medical condition and BOP policy.  Ellis and Dr. Burgos allege Plaintiff fails to show they had subjective knowledge of a risk of serious harm to Plaintiff.  Dr. Chipi contends that she and Plaintiff had a difference of opinion about any follow-up treatment he should have received after the biopsy. Defendants contend that, while the BOP is required by statute to provide medical care to inmates, nothing mandates specific treatment for an inmate.   Defendants also contend that Plaintiff's results from the liver biopsy did not qualify him for the treatment protocol under the 2003 or 2005 Guidelines.  Defendants further contend that nothing in BOP policy mandates that inmates with hepatitis C receive interferon/ribavirin therapy.

Plaintiff alleges he was diagnosed with hepatitis C in December 2002, and this diagnosis was confirmed in January 2003.  Plaintiff asserts he was forced to wait 30 months to receive a liver biopsy, 18 months of which occurred after the Central Office approved this procedure.   Plaintiff also asserts that, rather than ordering tests to determine his genotype and viral load, scheduling a biopsy, and ordering treatment, Ellis and Dr. Burgos monitored his blood, urine, and the slow deterioration of his liver.

Plaintiff alleges that there is a question of whether the delay in being given treatment constitutes deliberate indifference to his serious medical needs.

The Eighth Amendment's proscription against cruel and unusual punishment imposes a constitutional duty upon a prison official to take reasonable measures to guarantee the safety of inmates. The standard for cruel and unusual punishment, embodied in the principles expressed in Estelle v. Gamble, 429 U.S. 97, 104 (1976), is whether a prison official exhibits a deliberate indifference to the serious medical needs of an inmate. Farmer v. Brennan, 511 U.S. 825, 828 (1994).[6] However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle, 429 U.S. at 105). Rather, "an inmate must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994).

In order to prove a deliberate indifference claim, a prisoner must overcome three obstacles. The prisoner must: 1) "satisfy the objective component by showing that [he] had a serious medical need"; 2) "satisfy the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need"; and 3) "show that the injury was caused by the defendant's wrongful conduct." Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). A medical need is serious if it "'has been diagnosed by a physician as *mandating* treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id.

---

[6] Although the case law cited applies 42 U.S.C. § 1983 principles, the same standards apply to Bivens actions. Failure to apply the same standards against state (§ 1983) and federal (Bivens) officials would create an imbalance in the availability of a remedy for the same conduct. Rodriguez-Mora v. Baker, 792 F.2d 1524 (11th Cir. 1986).

AO 72A
(Rev. 8/82)

(quoting Hill, 40 F.3d at 1187) (emphasis supplied). As for the subjective component, the Eleventh Circuit has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety." Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995). Under the subjective prong, an inmate "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Goebert, 510 F.3d at 1327. It is legally insufficient to sustain a cause of action for deliberate indifference to serious medical needs simply because the inmate did not receive the medical attention he deemed appropriate. Harris, 941 F.2d at 1505.

"The meaning of 'more than gross negligence' is not self-evident[.]" Goebert, 510 F.3d at 1327. In instances where a deliberate indifference claim turns on a delay in treatment rather than the type of medical care received, the factors considered are: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Id. "When the claim turns on the quality of the treatment provided, there is no constitutional violation as long as the medical care provided to the inmate is 'minimally adequate.'" Blanchard v. White Co. Det. Center Staff, 262 F. App'x 959, 964 (11th Cir. 2008) (quoting Harris, 941 F.2d at 1504). "Deliberate indifference is not established where an inmate received care but desired different modes of treatment." Id.

Dr. Burgos ("Burgos") was the Clinical Director at FCI Jesup for most of Plaintiff's incarceration at that institution and was responsible for the clinical care provided at FCI Jesup, including evaluating patient care. Burgos states in his Declaration that Plaintiff had hepatitis C ("HCV") prior to being housed at FCI Jesup in May 2002. According to

Burgos, Plaintiff was placed in the infectious disease chronic care clinic, and his HCV was "frequently monitored", including having "a liver ultrasound which found [Plaintiff's] liver to be normal." (Defs.' Ex. 30, ¶ 4). Burgos avers that, every time Plaintiff was seen in the infectious disease chronic care clinic, he denied having any symptoms consistent with an acute change of liver functioning (weight loss, night sweats, nausea, and/or vomiting). (Id. at ¶ 5). Burgos asserts that the administrative remedy response by the Central Office, which offered Plaintiff a liver biopsy, was a recommendation only. Burgos also asserts this recommendation had to be evaluated by the Utilization Review Committee ("URC") for approval and "prioritized given the institution's concerns. Once the URC approved the liver biopsy, Plaintiff was scheduled to receive [one]." (Id. at ¶ 6).

Ellis ("Ellis"), the Health Services Administrator at FCI Jesup[7], contends his duties and responsibilities include "planning, implementing, directing, and controlling all aspects of the administration of the [medical] department." (Defs.' Ex 31, ¶ 3). Ellis administratively supervises the staff, excluding the Clinical Director. Ellis denies Plaintiff's allegations, particularly Plaintiff's allegation that he told Plaintiff he would never receive a liver biopsy or treatment. Ellis states he is not authorized under BOP policy to order medical or surgical procedures, nor does he have the authority to refuse a medical or surgical procedure which the Clinical Director deems necessary. Ellis also states that any referrals for medical treatment must come from a clinical practitioner. Ellis further states that, while he is responsible for scheduling all the medical care at FCI Jesup, he cannot do so until the Clinical Director determines the necessity for the care.

---

[7] Ellis held this position from April 2002 until February 2005, and he returned to this position in December 2007. (Defs.' Ex. 31, ¶ 2).

AO 72A
(Rev. 8/82)

Ellis asserts he could not schedule Plaintiff for a liver biopsy without a recommendation from the Clinical Director and that, if Plaintiff had a recommendation for a liver biopsy, Ellis could not deny or delay Plaintiff's receipt of this procedure. (Id. at ¶¶ 5-8).

Dr. Chipi ("Chipi") is currently the staff physician at FCI Jesup, and she served as acting Clinical Director and/or Clinical Director from July 2005 through October 2006. As Clinical Director, Chipi states she was responsible for medical care at FCI Jesup, including evaluating patient care. Chipi contends Plaintiff had an infectious disease chronic care clinic visit on March 18, 2005, at which he denied having any symptoms consistent with changes in liver function; because of Plaintiff's denial, Chipi asserts Plaintiff's chronic care appointments were changed to every 180 days. (Defs.' Ex. 35, ¶ 4). Chipi asserts Plaintiff received a liver biopsy on July 19, 2005, and the results showed Plaintiff had "chronic hepatitis C exhibiting mild activity." (Id. at ¶ 5). Chipi also asserts she forwarded the "Algorithm for Treatment of Hepatitis C/Approval Form" to the Central Office for consideration of Plaintiff for hepatitis C treatment. (Id. at ¶ 6). Chipi states the Central Office's approval is required before an inmate's hepatitis C can be treated and that she cannot treat an inmate for hepatitis C without this approval.

Dr. Michael Nelson ("Nelson"), who is Board certified in family practice, was the Chief of Health Programs, Health Services Division, Central Office, during the relevant time period. Nelson states in his Declaration that he drafted Clinical Practice Guidelines for the BOP for the management of chronic conditions. Nelson also states he responded to all administrative remedies concerning hepatitis C. (Defs.' Ex. 28, ¶¶ 2-3). Nelson asserts the BOP's Guidelines for the care and treatment of hepatitis C contain recommendations which are based on published scientific studies. According to

Nelson, the BOP's practice of treatment for hepatitis C meets "a generally accepted professional standard of care." (Id. at ¶ 6). Nelson contends that, as part of his duties, he reviewed and approved or disapproved inmates for treatment for hepatitis C. Nelson contends that inmates whose liver biopsies did not reveal significant fibrosis were to obtain another liver biopsy at least three (3) years apart. The BOP's favored course of treatment is "a conservative approach of continued monitoring without treatment" if the fibrosis is not progressing. (Id. at ¶ 8). Nelson states that he reviewed Plaintiff's Algorithm for Treatment, which revealed Plaintiff's liver biopsy showed mild activity. Based on this finding, and in accord with the BOP's policies and guidelines, Dr. Nelson asserts he did not approve Plaintiff for treatment consisting of pegylated interferon and ribavirin but noted Plaintiff should have another biopsy in three to five years. (Id. at ¶ 9).

In her Declaration, Lillian Jimenez ("Jimenez"), the Regional Health Systems Administrator for the Southeast Region of the BOP in Atlanta, Georgia, avers she is responsible for the administrative supervision of BOP Health Services. Jimenez states her duties include developing, training, planning, programming, and evaluating the administrative aspects of the medical and dental programs within the region. Jimenez asserts that the 2003 Guidelines and the 2005 Guidelines, which "broadened the indications for liver biops[ies]", "represent the best care available at the time" and "meet a generally accepted professional standard of care." (Defs.' Ex. 43, ¶¶ 6-7). Jimenez also asserts, however, that she is not responsible for the adoption of these Guidelines; rather, she is responsible for informing other staff of the proper policy regarding treatment. Jimenez further asserts that any response she would have given to Plaintiff regarding his complaints about his medical care would have referenced the relevant

Guidelines. Jimenez states that Plaintiff's requested treatment would not be permitted under either the 2003 or 2005 Guidelines. (Id. at ¶¶ 10-11).

Defendants also submitted the Declaration of Bethzaida Hernandez-Ricoff ("Ricoff"), the Regional Medical Director, Southeast Region, at the Federal Correctional Complex in Coleman, Florida. Ricoff asserts she is responsible for "providing clinical oversight and monitoring of the Clinical Director at the institutional level, thereby ensuring the delivery of health care services in accordance with BOP treatment guidelines and established scope of services." (Defs.' Ex. 46, ¶ 2). Ricoff states she also provides medical reviews of regional administrative remedies concerning clinical medical care to ensure an inmate's medical care is appropriate given the inmate's medical condition and BOP policy. Ricoff also states that current treatment for hepatitis C, which consists of pegylated interferon and ribavirin, "poses multiple side effects, many of which may be life-threatening[,]' which is why "only inmates who are clearly at highest risk for progressing to advanced liver disease are offered treatment." (Id. at ¶ 7). Ricoff avers that Plaintiff's medical records reveal that he is not eligible for treatment for his hepatitis C, which should be and is being followed clinically at this time.

Plaintiff states in his Affidavit that he had a conversation with Dr. Burgos in May 2003 and that Dr. Burgos told him that the 2003 Guidelines screened out about 90% of all inmates for consideration of treatment; if Plaintiff were his private patient, he would have ordered Plaintiff to have a liver biopsy and treatment immediately unless Plaintiff had decompensated cirrhosis; and the BOP's Guidelines for HCV treatment were "written to promote conservative treatment, which. . . is contrary to the standards of most doctors in the community and allows thousands of federal prisoners who need

treatment to go untreated." (Pl.'s Ex. 1, ¶ 6). Plaintiff also states Dr. Burgos and Ellis refused to provide him with a liver biopsy for nearly two (2) years. Plaintiff contends that, after his liver biopsy was performed, Dr. Chipi refused to see him for any exam, chronic care clinic, or treatment. (Id. at ¶¶ 12, 14). Plaintiff also contends that Dr. Chipi lied about having sent a treatment request to the Central Office. (Id. at ¶ 16).

Plaintiff also submitted the Affidavit of Charles Foster ("Foster"), who was housed at FCI Jesup at the same time as Plaintiff. Foster asserts he overheard a conversation Plaintiff and Dr. Burgos had about the physician's assistant discontinuing Plaintiff's quarterly blood tests and reducing the number of tests to two (2) a year. Foster asserts Dr. Burgos told Plaintiff that, even if he had elevated enzyme levels, he would not be approved for treatment because he did not fit the BOP's criteria for treatment. Foster also asserts Dr. Burgos told Plaintiff that, if Plaintiff were under his private care, he would have already had a liver biopsy and would have treatment therapy. (Pl.'s Ex. 7, ¶¶ 4-5). Foster also states that he heard Ellis tell Plaintiff on another occasion that he did not provide inmates with copies of the BOP's hepatitis C protocol, but, if Plaintiff wanted a copy, he could send a Freedom of Information Act ("FOIA") request to the Central Office. Foster further states Dr. Burgos informed Plaintiff that the inmates who had been approved for liver biopsies had elevated ALT enzyme levels while Plaintiff did not. According to Foster, Plaintiff told Dr. Burgos reliance on elevated ALT enzyme levels as a prerequisite for a liver biopsy was "inconsistent with the consensus in the medical community and community standards, which holds (sic) that ALT enzyme levels are often [phantom] numbers" and that the "Gold-Standard Test for determining the current stage and progress" of hepatitis C is with a liver biopsy. (Id. at ¶ 7). Finally,

Foster asserts Ellis told Plaintiff after the Central Office stated Plaintiff should be offered a liver biopsy that Plaintiff would have a biopsy whenever they got around to it but that Plaintiff, as far as he (Ellis) was concerned, would not get a biopsy or treatment. (Id. at ¶ 8; Pl.'s Ex. 24, ¶ 17); see also Pl.'s Ex. 27, Affidavit of Kenneth Dunham, ¶ 10 (stating that Dr. Burgos told him that Plaintiff made a huge mistake by challenging the treatment guidelines and that Plaintiff would never receive a liver biopsy or treatment as long as it was up to him and Ellis).

The parties submitted copies of the February 2003 "Clinical Practice Guidelines for the Prevention and Treatment of Viral Hepatitis", which were in place until October 2005. (Pl.'s Ex. 5; Defs.' Ex. 29). These Guidelines set forth treatment considerations and evaluation strategy for long-term inmates who have chronic HCV infection. Treating physicians should consider many factors in "assessing the appropriateness of treatment and the best timing for initiating treatment" for inmates with chronic HCV infection, including: 1) only "10%-15% of persons with HCV infection develop significant long term complications of liver disease, usually 20-30 years after initial infection;" 2) laboratory parameters do not definitively predict which infected inmates will develop cirrhosis or respond to medical therapy; 3) moderate to severe fibrosis and inflammation and necrosis on a liver biopsy "are currently the best markers for determining" which inmates should be offered antiviral therapy; 4) antiviral therapy is effective increasingly in clearing viral loads and "establishing sustained viral response rates (SVR); 5) serious drug effects may occur, even though antiviral therapy is well-tolerated typically; and 6) future treatments for hepatitis C may be more effective and more easily tolerated. (Pl.'s Ex. 5, pp. 45-46; Defs.' Ex. 29, pp. 41-42). The Guidelines also set forth criteria for

identifying candidates for liver biopsies and advises that inmates with chronic HCV infection should be "periodically evaluated and have ALT levels monitored to help determine" whether a biopsy is warranted. (Id. at 42, Pl.'s Ex. 5, p. 46). Inmates with "normal" ALT levels (about 30% of people with chronic HCV infection) should have these levels re-measured several times in a 2 to 12 month period, and those inmates with "persistently normal ALT levels (at least 3 normal values over a 6 to 12 month period) with no clinical or laboratory evidence of liver disease, are unlikely to have marked liver inflammation or fibrosis." (Defs.' Ex. 29, p. 42, Pl.'s Ex. 5, p. 46). The 2003 Guidelines state that a liver biopsy usually would not be warranted if the inmate's ALT Levels were persistently normal. The Guidelines directed medical care providers that, every 6 to 12 months, a targeted history and physical examination should be conducted, along with platelet count, AST, ALT, alkaline phosphatase, and prothrombin time measurements. Those inmates with minimally elevated ALT levels, described as less than two times the upper limit of normal, should have their levels re- measured over 3 to 6 months and reassessed; liver biopsies were to be made on a case-by-case basis. In cases where the inmates were monitored without a biopsy, the inmates should have had a targeted history and physical examination conducted, along with platelet count, AST, ALT, alkaline phosphatase, and prothrombin time measurements. (Pl.'s Ex. 5, p. 47; Defs.' Ex. 29, 43). Finally, in those cases where the inmate's ALT levels are two times normal or greater, the inmate should have ALT measurements repeated at least two times in a 6 month period. If the inmate has persistent elevations in his ALT levels, he should be referred directly for a liver biopsy, unless antiviral therapy is contraindicated. Inmates with chronic hepatitis C and a liver biopsy with portal or

bridging fibrosis and at least moderate inflammation and necrosis are recommended for antiviral therapy; inmates with normal liver histology or minimal fibrosis should be re-biopsied every one to five years.

According to the October 2005 Guidelines, inmates with abnormal serum ALT values, liver biopsies with chronic hepatitis with significant fibrosis, compensated liver disease and no evidence of hepatic encephalopathy or ascites, and acceptable pre-treatment labs are "priority candidates for antiviral therapy[.]" (Pl.'s Ex. 6, p. 30; Defs.' Ex. 47, p. 30).[8] "Pegylated interferon. . . plus ribavirin is the preferred drug regimen for treating hepatitis C in the absence of contraindications to either drug." (Pl.'s Ex. 6, p. 31).

Defendants submitted copies of Plaintiff's institutional medical records from December 2, 2002, until November 28, 2005.[9] On December 3, 2002, Plaintiff was seen in the medical unit and requested a hepatitis test; Plaintiff was given a "routine" hepatitis panel. (Defs.' Ex. 2). Plaintiff was seen again in medical on January 10, 2003, requesting the results of his blood work, which revealed he is hepatitis C positive. Plaintiff was educated on his diagnosis and was referred to Dr. Burgos for consideration to be placed in the infectious disease chronic care clinic. Plaintiff was advised to limit his Tylenol intake as much as possible due to his hepatitis C. (Defs.' Ex. 3). Dr. Burgos examined Plaintiff on January 23, 2003, and this examination confirmed Plaintiff's hepatitis C diagnosis. Dr. Burgos' plan was to follow the BOP's hepatitis C protocol,

---

[8] The undersigned has not included discussion of liver biopsy requirements set forth in the October 2005 Guidelines, as these Guidelines became effective after Plaintiff received a biopsy.

[9] The undersigned narrowed his focus to the medical records compiled during Plaintiff's incarceration at FCI Jesup from 2002 until his transfer to another facility in 2005. Plaintiff's allegations that individuals other than the medical care providers at FCI Jesup are responsible for his medical care are not relevant to the Court's inquiry.

obtain a liver ultrasound, and adding Plaintiff to the infectious disease chronic care clinic. (Defs.' Ex. 4). Plaintiff was seen in the infectious disease chronic care clinic on April 17, 2003, and he denied having chills, nausea, vomiting, fatigue, diarrhea, or constipation. It was noted that Plaintiff's present management would continue and that he was to return on an as needed basis. (Defs.' Ex. 6). Plaintiff's liver ultrasound was requested on May 23, 2003, as a follow-up for his hepatitis C diagnosis. (Defs.' Ex. 5). Plaintiff was seen again in the infectious disease chronic care clinic on July 11, 2003. Plaintiff denied having fever, chills, night sweats, nausea, or vomiting, but he reported having borderline elevated enzymes and wanted to see Dr. Burgos for treatment of his hepatitis C. (Defs.' Ex. 7). On October 15, 2003, the physician's assistant ordered that Plaintiff undergo a chemical lab and lipids for his liver and was to return to the infectious disease chronic care clinic in 90 days. (Defs.' Ex. 8). Plaintiff was seen in the infectious disease chronic clinic on January 20, 2004, and stated he was awaiting his liver biopsy and denied any jaundice, fatigue, or abdominal pain. (Defs.' Ex. 9). On April 8, 2004, Plaintiff again denied having fever, chills, night sweats, fatigue, or diarrhea. Plaintiff was educated and reassured about the management plan in place for his hepatitis C. (Defs.' Ex. 10). On August 20, 2004, medical staff performed a chart review for Plaintiff's hepatitis C treatment to determine whether Plaintiff met the clinical guidelines for a liver biopsy, and Plaintiff's viral load and genotype were requested for further evaluation. (Defs.' Ex. 11). According to Plaintiff's medical records, he was seen in the infectious disease chronic care clinic on October 4, 2004, and complained the he had been waiting since February to have a liver biopsy. Plaintiff denied having fatigue, fever, nausea, or vomiting. It was noted that the URC was to be consulted. (Defs.' Ex.

12). Plaintiff was seen in the infectious disease chronic care clinic on December 30, 2004. At that time, Plaintiff stated he was approved for a liver biopsy and peg interferon therapy about a year prior to this visit and denied any fever, chills, or shortness of breath. It was noted that Plaintiff would have a consultation pending the liver biopsy. A note dated January 7, 2005, states that Plaintiff's hepatitis C is of the type 1 genotype. (Defs.' Ex. 13). Plaintiff was seen again in the infectious disease chronic care clinic on March 18, 2005, at which time he had "no significant complaints" and denied having fever, fatigue, chills, nausea, vomiting, or diarrhea. (Defs.' Ex. 14, p. 1). Plaintiff was to return to the clinic in 180 days. On July 13, 2005, Plaintiff's ALT was elevated at 75 and his RBC was decreased at 438. (Defs.' Ex. 15). Plaintiff had a liver biopsy performed at Wayne Memorial Hospital on July 19, 2005, and the results of his biopsy revealed he had chronic hepatitis C exhibiting mild activity, mild portal fibrosis, and no evidence of cirrhosis. (Defs.' Ex. 16). In the Algorithm for Treatment of Hepatitis C form dated July 21, 2003, Dr. Chipi noted Plaintiff's last three (3) ALT levels were 78, 70, and 75; Plaintiff's HCV RNA positive reading was greater than 700,000; he had a liver biopsy on July 19, 2005, which indicated he had chronic hepatitis C exhibiting mild activity; he had a negative ultrasound of the right upper quadrant of his liver; and his HCV genotype was 1. On November 11, 2005, after Plaintiff was transferred to FCI Bennettsville, Plaintiff was disapproved for post-biopsy treatment and directed to have a repeat biopsy in 3-5 years. (Defs.' Ex. 17).

Plaintiff submitted copies of his laboratory results obtained after blood and/or urine samples were taken. These results are dated from December 16, 2002, through August 16, 2005. (Pl.'s Exs. 10-15, p. 2).[10]

The evidence before the Court indicates Plaintiff received medical care and treatment from the medical care providers at FCI Jesup for his HCV condition. After his initial diagnosis of hepatitis C on December 3, 2002, Plaintiff was seen on no fewer than 13 occasions in the approximately two and one half years' time he was housed at FCI Jesup. Plaintiff's visits to the infectious disease chronic care clinic occurred approximately every 90 days until March 18, 2005, when his visits were scheduled for every 180 days, presumably because Plaintiff did not report any significant complaints about his condition and appeared to be asymptomatic. Defendant Watts informed Plaintiff via a response to Administrative Remedy request No. 306238-A1, dated January 6, 2004, that it was determined a liver biopsy would be offered to Plaintiff, and Plaintiff had a biopsy performed on July 19, 2005. However, an 18 month period between Watts' determination and the actual biopsy does not, *ipso facto*, equate to Dr. Burgos and Ellis exhibiting deliberate indifference to Plaintiff's serious medical needs. Plaintiff was seen in the chronic care clinic on at least 5 occasions during this time. In addition, before a liver biopsy could be ordered, the URC had to approve Plaintiff getting this procedure, per BOP policy. Plaintiff offers nothing to refute that this requirement had to be met. Further, two (2) days after Plaintiff's liver biopsy, Dr. Chipi's Algorithm for Treatment was completed. The treatment request was disapproved by another BOP

---

[10] The relevant portions of the record are for Plaintiff's incarceration period at FCI Jesup. The undersigned is unable to discern the meaning of the lab results, but for purposes of an Eighth Amendment analysis, the undersigned notes Plaintiff had lab work performed on several occasions during his confinement at FCI Jesup.

official, Defendant Nelson. At most, Plaintiff sets forth evidence that his opinion on his treatment course differed from the manner in which Dr. Burgos, Ellis, and Dr. Chipi treated him. This does not rise to the level of a constitutional violation. To the extent Plaintiff contends that Dr. Burgos, Ellis, and Dr. Chipi delayed his treatment, there is no evidence that any alleged delays caused Plaintiff to suffer any constitutional harm. The evidence before the Court reveals Plaintiff did not meet the BOP's requirements, as determined by Dr. Burgos, Ellis, Dr. Chipi, Dr. Nelson, Jimenez, and Ricoff, in order to receive antiviral treatment for his HCV after the liver biopsy was performed. In short, Plaintiff received medical care for his HCV, even if that care was not what Plaintiff deemed to be the proper course of care and treatment. This portion of Defendants' Motion should be **granted**. Plaintiff's Eighth Amendment claims against Dr. Burgos, Ellis, Dr. Chipi, Dr. Nelson, Jimenez, and Ricoff should be **dismissed**.

## III.   Retaliation

Wheeler, Shaw, Vasquez, and Sumner contend Plaintiff's transfer to another penal institution was not because Plaintiff sought treatment for his medical condition or because Plaintiff exercised his First Amendment rights. Wheeler, Shaw, Vasquez, and Sumner assert they did not place Plaintiff on a transfer list to the Federal Correctional Institution in Marianna, Florida, and there is no evidence Plaintiff actually was placed on a transfer list. Wheeler, Shaw, Vasquez, and Sumner also assert Plaintiff was transferred to the Federal Correctional Institution in Bennettsville, South Carolina, because the facility just opened and needed inmates to populate the facility. Wheeler, Shaw, Vasquez, and Sumner further assert FCI Jesup and Bennettsville were the same

security and custody levels and that medical care received at one facility could be received at the other.

Plaintiff alleges Wheeler, Shaw, Vasquez, and Sumner knew about his medical condition, his challenge to the 2003 Guidelines, and the grievance he filed against Dr. Burgos and Ellis. Plaintiff also alleges Wheeler, Shaw, Vasquez, and Sumner played important roles in attempting to transfer him to FCI Marianna and were responsible in whole or in part for his retaliatory transfer to FCI Bennettsville. Plaintiff contends he spoke with Warden Vasquez and explained to him that Wheeler and Sumner targeted him for a transfer in retaliation for filing a grievance and for helping other inmates file grievances. Plaintiff alleges Warden Vasquez would not investigate his complaints. Plaintiff avers Wheeler and Sumner told Plaintiff he would not be allowed to stay at FCI Jesup because he liked to complain and file grievances. Plaintiff asserts Dr. Burgos and Ellis retaliated against him by refusing to honor the Central Office's Response to his BP-11.[11]

"To state a First Amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right." Taylor v. Nix, 240 F. App'x 830, 836 (11th Cir. 2007) (quoting Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003)). Rather, "[t]he gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." Farrow, 320 F.3d at 1248. A prisoner can establish retaliation by demonstrating that the prison official's actions were "the result of his having filed a grievance concerning the conditions of his imprisonment." Id.

---

[11] While the undersigned has recommended Plaintiff's Eighth Amendment claims against Dr. Burgos and Ellis be dismissed, this does not translate to an automatic recommendation that Plaintiff's retaliation claims against Dr. Burgos and Ellis be dismissed. The Farrow case notes that a plaintiff can establish retaliation by showing a defendant took action (which may or may not be a constitutional violation) in response to a prisoner's exercise of his First Amendment right to redress.

Once a defendant moves for summary judgment, "the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Crawford-El v. Britton, 523 U.S. 574, 600 (1998). "The issue of intent is a question for the trier of fact." Harris v. Ostrout, 65 F.3d 912, 917 (11th Cir. 1995). "Direct evidence of an illegal motive will usually suffice to create a genuine issue of fact and preclude summary judgment." Id. (citing Swint v. City of Wadley, Ala., 51 F.3d 988, 1000 (11th Cir. 1995)).

Randall Sumner ("Sumner"), a unit manager and correctional counselor at FCI Jesup, implicitly states in his Declaration that he did not retaliate against Plaintiff by attempting to have Plaintiff transferred to another facility or to keep him from obtaining a liver biopsy and treatment for his medical condition. Sumner denies having told Plaintiff that he was going to be transferred to another institution and that he would not have treatment for his liver. Sumner asserts he is not authorized to determine or provide medical treatment to any inmate. Sumner also asserts that, as a correctional counselor, he is not involved in inmate transfers. (Defs.' Ex. 33).

Cameron Wheeler ("Wheeler"), a case manager at FCI Jesup, is responsible for the management of inmates, including preparing transfer packets for them. Wheeler has "no memory of a transfer list to . . . FCI Marianna[ ] containing Plaintiff's name." (Defs.' Ex. 34, ¶ 5). According to Wheeler, Plaintiff's transfer to FCI Bennettsville was a Code 318 transfer to populate that facility. Wheeler states FCI Bennettsville just opened and needed inmates, and since it is the same classification as FCI Jesup, inmates appropriate for one were suitable for the other institution, absent unusual

circumstances. Wheeler asserts that the institution's medical staff must screen all inmates scheduled for a transfer and determine the inmate's medical suitability for the transfer. (Defs.' Ex. 34).

Kendall Shaw ("Shaw") is a unit manager at FCI Jesup and supervises unit staff, including case managers and counselors. Shaw contends Plaintiff only makes allegations against him regarding one transfer. Shaw also contends Plaintiff raised concerns about being transferred to FCI Bennettsville given his medical condition, but the medical staff determined, after screening Plaintiff, that his medical condition would not block his transfer to another facility, as he could receive any medical treatment he needed at FCI Bennettsville. Shaw avers Plaintiff was transferred to FCI Bennettsville not as retaliation, but because that facility just opened and needed inmates to populate the institution. Shaw states these two facilities were the same classification, and inmates suitable for one institution were suitable for the other institution, absent unusual circumstances. Shaw denies telling Plaintiff he did not have a right to treatment for a condition he had prior to being incarcerated. Shaw states he is not part of the medical staff and is not authorized to determine or provide medical treatment or advice to any inmate. (Defs.' Ex. 36).

In his Declaration, Jose Vasquez ("Vasquez"), the former warden at FCI Jesup, asserts that he was responsible for the overall operation of the institution but had no involvement in the management of individual inmates. Vasquez states he does not recall Plaintiff discussing his medical issues with him, nor does he remember Plaintiff being on a list to be transferred to FCI Marianna. Vasquez also states Plaintiff's transfer to FCI Bennettsville was due to that facility opening and needing inmates to populate it

and not out of retaliation for Plaintiff seeking medical treatment at FCI Jesup. Vasquez further states FCI Jesup and FCI Bennettsville have the same classification level, and inmates appropriate for one facility were appropriate for the other, barring unusual circumstances. Vasquez asserts that he told Plaintiff in response to an Administrative Remedy request that his medical files would be transferred to his new facility if he were transferred, and his medical care would continue without interruption. Vasquez contends that the medical department clears all inmates for transfer before the actual transfer and that, if there were a medical concern, the medical department would notify appropriate staff to have that inmate removed from the transfer list. Vasquez also contends he is not authorized to order a medical or surgical procedure or to refuse any medical or surgical procedure the Clinical Director deemed necessary. (Defs.' Ex. 37).

In a correspondence addressed to Lappin, Plaintiff contends that Dr. Burgos and Ellis told him that they would not schedule a liver biopsy as long as he was under care at FCI Jesup. Plaintiff asserts Dr. Burgos' and Ellis' "position has its roots in retaliation for my challenge to the treatment guidelines and the fact that they had failed to process paperwork for inmates at FCI Jesup medium for liver biopsies and treatment." (Pl.'s Ex. 17) (emphasis in original). Plaintiff states that Dr. Burgos and Ellis scrambled to have several inmates approved for liver biopsies and treatments in an effort to cover up the fact that no inmate had ever been approved prior to Plaintiff's complaints. (Pl.'s Ex. 18). Plaintiff authored an Inmate Request to Staff form directed at Dr. Chipi after she became Clinical Director, and he recounted that the delays in receiving a biopsy and treatment were "knowing and intentional and occurred the result (sic) of exercising my right to challenge the BOP's [h]epatitis C Pre-Treatment Protocol." (Pl.'s Ex. 19, p. 3).

Plaintiff contended that Dr. Burgos told him in November 2004 and May and June 2005 that he would have already received a liver biopsy and treatment if Plaintiff had not filed a grievance complaining about the protocol. (Id. at pp. 3-4); see also Pl.'s Ex. 20, p. 2.

Plaintiff submitted a copy of a list containing 35 names, including Plaintiff's and fellow inmate Charles Foster's, who were directed to see Mr. Wheeler. According to Plaintiff, this list was a Preliminary FCI Marianna Transfer List. (Pl.'s Ex. 26). Foster states in his Affidavit that he and Plaintiff spoke to Wheeler and told him they did not want to be transferred based on their treatment for hepatitis C. Foster asserts Wheeler said that Plaintiff "has no choice but to go because we're tired of his filing and complaining[.]" (Pl.'s Ex. 24, ¶ 6). Foster also asserts he was present when Plaintiff informed Warden Vasquez that he was being transferred as retaliation for challenging the treatment guidelines and for causing Dr. Burgos and Ellis to request biopsies and treatment for several inmates based on his challenges. (Id. at ¶ 10). Foster states that Warden Vasquez would not intervene to stop the transfer because Warden Vasquez told Plaintiff it was a good idea for Plaintiff to leave FCI Jesup since he had made too many enemies by filing grievances. Foster also states he overheard a conversation between Plaintiff and Shaw who told Plaintiff he was being transferred to FCI Bennettsville because he exercised his constitutional rights. Foster further states Defendants Wheeler and Sumner laughed at Plaintiff's name being on the FCI Bennettsville transfer list and reminded Plaintiff that he was warned about filing grievances and complaining. (Id. at ¶¶ 11-13).

Another fellow inmate, Kenneth Dunham ("Dunham"), states Dr. Burgos told him that Plaintiff "made a huge mistake in filing his grievance challenging the treatment

guidelines," and that Plaintiff "would never receive a liver biopsy or treatment as long as it were up to him and Ellis." (Pl.'s Ex. 27, ¶ 10). Dunham also states he was present when Plaintiff asked Warden Vasquez about the attempt to transfer him to FCI Marianna out of retaliation for Plaintiff filing a grievance challenging the BOP's treatment guidelines. According to Dunham, Warden Vasquez refused to investigate Plaintiff's allegations and told Plaintiff he should have considered the consequences of his actions before he filed a grievance. (Id. at ¶¶ 12-13).

Sydney Nash ("Nash"), another fellow inmate, contends Plaintiff told him that Dr. Burgos and Ellis told Plaintiff that he would not have a liver biopsy as long as he was housed at FCI Jesup because Plaintiff's actions caused Dr. Burgos and Ellis to initiate liver biopsies and treatments for other inmates due to his complaints. Nash also states Plaintiff called him and told him FCI Marianna was going to be re-opened and that Defendants Wheeler and Sumner were going to transfer inmates to "cleanse" their housing unit of any inmates considered a "problem", such as Plaintiff who filed a grievance. (Pl.'s Ex. 28, ¶ 10).

Plaintiff has provided sufficient evidence by which a reasonable trier of fact could conclude Warden Vasquez, Wheeler, Shaw, Sumner, Dr. Burgos, and Ellis took action against Plaintiff as retaliation because Plaintiff filed a grievance about the hepatitis C treatment protocols. Thus, Plaintiff has overcome his burden and has shown there are genuine issues of material fact in existence regarding his claims that Warden Vasquez, Wheeler, Shaw, Sumner, Dr. Burgos, and Ellis retaliated against him. The undersigned recognizes the Second Declarations of Dr. Burgos and Wheeler, which were filed in response to Plaintiff's documentary evidence. These Declarations do not tip the scales

in favor of granting this portion of Defendants' Motion. To permit this would render the undersigned the trier of fact on Plaintiff's retaliation claim by weighing the credibility of the Defendants and of Plaintiff and his witnesses. The only comment the undersigned makes regarding the credibility of the parties is that Plaintiff has pointed to evidence which creates a genuine issue of material fact as to whether Warden Vasquez, Wheeler, Shaw, Sumner, Dr. Burgos, and Ellis retaliated against him and which is not an attack on the Defendants' credibility. This portion of Defendants' Motion should be **denied**.

## IV. Conspiracy

Defendants contend Plaintiff fails to show that they violated his constitutional rights or conspired to do so. Accordingly, Defendants assert, Plaintiff's conspiracy claims should be dismissed because Plaintiff has not proved the existence of an agreement to act among any of the Defendants.

Plaintiff asserts Wheeler, Warden Vasquez, Shaw, and Sumner conspired to transfer him to another penal institution. Plaintiff also asserts Nelson, Young, Watts, and Dr. Chipi conspired to manufacture the "Hepatitis C Treatment packet" mentioned in the response to Plaintiff's BP-11 to make it appear that the medical attention he received was sufficient and complete. (Doc. No. 78, p. 52). Plaintiff further asserts a treatment request was made seven (7) days after he was transferred to Bennettsville "in a conspiratorial plot to cover up the fact that no one had followed through with the preparation and submission of a treatment request." (Id. at 54).

A conspiracy "to violate another person's constitutional rights states a cause of action pursuant to Bivens." See Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1283

(11th Cir. 2002). "To establish a prima facie case of . . . conspiracy, a plaintiff must show, among other things, that [a] defendant[ ] "'reached an understanding to violate [his] rights.'" Id. (quoting Strength v. Hubert, 854 F.2d 421, 425 (11th Cir.1988)). A "plaintiff does not have to produce a 'smoking gun' to establish the 'understanding' or 'willful participation' required to show a conspiracy, but must show some evidence of agreement between the defendants. Id. at 1283-84 (quoting Bendiburg v. Dempsey, 909 F.2d 463, 469 (11th Cir.1990)). "For a conspiracy claim to survive a motion for summary judgment a mere scintilla of evidence will not suffice; there must be enough of a showing that the jury could reasonably find for [the non-moving] party." Id. at 1284 (internal citation and punctuation omitted).

Watts and Young assert they had no personal involvement in the events Plaintiff alleges to have occurred. (Defs.' Ex. 40, ¶ 8; Defs.' Ex. 38, ¶ 6). Warden Vasquez, Shaw, Wheeler, and Sumner assert they are not aware of, nor did they participate in a conspiracy for any purpose against Plaintiff or any other inmate. (Defs.' Ex. 38, ¶ 9; Defs.' Ex. 36, ¶ 4; Defs.' Ex. 34, ¶ 4; Defs.' Ex. 33, ¶ 4).

Plaintiff states in his Affidavit that he learned Dr. Chipi had not sent anything to the Central Office regarding treatment for his hepatitis C as of October 17, 2005. Plaintiff also states Ms. Oliver, the medical records technician at FCI Jesup, told him that Dr. Chipi lied about having submitted a treatment request on his behalf. (Pl.'s Ex. 1, ¶ 16). In a written response to Plaintiff's request for a copy of Dr. Chipi's request for treatment, Ms. Oliver informed Plaintiff that that paperwork was not maintained in his medical records. (Pl.'s Ex. 21). Foster stated that Plaintiff accused Wheeler, Sumner, Dr. Burgos, and Ellis of conspiring together to deny him a liver biopsy and treatment and

to transfer him to another institution because Plaintiff had challenged the BOP's treatment guidelines. (Pl.'s Ex. 24, ¶ 7).

Plaintiff has offered no evidence whatsoever which could reveal that Defendants Wheeler, Vasquez, Shaw, and Sumner reached a conspiratorial agreement to transfer Plaintiff to another federal penal institution for any reason. Likewise, the record is bereft of any evidence that Defendants Nelson, Young, Watts, and Chipi reached an agreement to manufacture evidence related to Plaintiff's medical care and treatment plans. This portion of Defendants' Motion should be **granted**. Plaintiff's claims that Defendant Wheeler, Vasquez, Shaw, Sumner, Nelson, Young, Watts, and Chipi engaged in conspiracies against him should be **dismissed**.

## V. Qualified Immunity

Defendants Vasquez, Wheeler, Shaw, Sumner, Dr. Burgos, and Ellis contend they are entitled to qualified immunity from suit based on Plaintiff's claims that they retaliated against him. Plaintiff asserts these Defendants are not entitled to qualified immunity.

Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities, so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Gonzalez v. Reno, 325 F.3d 1228, 1232 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). A government official must first prove that he was acting within his discretionary authority. Id. at 1233; Ray v. Foltz, 370 F.3d 1079, 1081-82 (11th Cir. 2004). A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions

occurred in the performance of the official's duties and within the scope of this authority. Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006). Once the government official has shown he was acting within his discretionary authority, the burden shifts to the Plaintiff to show that the Defendant is not entitled to qualified immunity. The Supreme Court has established a two-part test to determine the applicability of qualified immunity: First, the court must determine whether plaintiff's allegations, if true, establish a constitutional violation. Hope, 536 U.S. at 736. If, under the plaintiff's allegations, the defendants would have violated a constitutional right, then "the next, sequential step is to ask whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001); Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).

For the reasons set forth in the preceding sections, this portion of Defendants' Motion is without merit. Accepting Plaintiff's allegations as true, he has stated colorable claims for relief based on the alleged retaliatory actions of Defendants Vasquez, Wheeler, Shaw, Sumner, Burgos, and Ellis, which would be a violation of Plaintiff's clearly established constitutional rights. Thus, Defendants Vasquez, Wheeler, Shaw, Sumner, Burgos, and Ellis are not entitled to immunity from suit in their individual capacities. This portion of Defendants' Motion should be **denied**.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, be **GRANTED** in part and **DENIED** in part. It is my **RECOMMENDATION** that Plaintiff's claims against the Bureau of Prisons, the United States of America, Nelson, Lappin, Watts, Holt, Young,

Sunderman, Kendig, Jimenez, Ricoff, and Chipi be **DISMISSED**. It is also my **RECOMMENDATION** that Plaintiff's deliberate indifference claims against Defendants Burgos and Ellis be **DISMISSED**. It is my further **RECOMMENDATION** that Plaintiff's retaliation claims against Defendants Vasquez, Wheeler, Shaw, Sumner, Burgos, and Ellis remain pending. Defendants Vasquez, Wheeler, Shaw, Sumner, Burgos, and Ellis are ordered to advise the Court if they will waive personal service or if they will bear the costs of personal service.

　　　　**SO ORDERED, REPORTED** and **RECOMMENDED**, this _26th_ day of February, 2009.

　　　　　　　　　　　　　　　JAMES E. GRAHAM
　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE